UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Trustees of the
BRICKLAYERS PENSION TRUST FUND –
METROPOLITAN AREA; BRICKLAYERS AND
TROWEL TRADES INTERNATIONAL RETIREMENT
SAVINGS PLAN; BRICKLAYERS HOLIDAY TRUST
FUND, METROPOLITAN AREA; TROWEL TRADES
HEALTH AND WELFARE FUND, DETROIT AND
VICINITY; BRICKLAYERS AND TROWEL TRADES
INTERNATIONAL PENSION FUND; DETROIT
METROPOLITAN MASONRY JOINT APPRENTICESHIP
AND TRAINING COMMITTEE; BRICKLAYERS
INTERNATIONAL MASONRY INSTITUTE;
LABOR-MANAGEMENT COOPERATION COMMITTEE,

        Plaintiffs,

v                              Case No. 08-15200
                              Hon. ROBERT H. CLELAND

METRO JOINT SEALANTS, L.L.C./ METRO
JOINT SEALANTS OF MICHIGAN, INC.,

        Defendants.

_____/

SACHS WALDMAN                PLUNKETT COONEY
George H. Kruszewski (P25857)    Stanley C. Moore, III (P23358)
Hope L. Calati (P54426)         Attorney(s) for Defendants
Amy Bachelder (P26401)         38505 Woodward Avenue, Suite 2000
Attorney(s) for Plaintiffs        Bloomfield Hills, MI  48304
1000 Farmer Street               (248) 901-4011
Detroit, MI  48206             smoore@plunkettcooney.com
(313) 965-3464
gkruszewski@sachswaldman.com

_____/

**DEFENDANTS' CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS**

NOW COME the Defendants, by and through their counsel of record, PLUNKETT COONEY and STANLEY C. MOORE, III, and for their Cross-Motion for Judgment on the Pleadings, state as follows.

1.     That through their Complaint and Motion, Plaintiff Funds seek to compel Defendants to submit to an audit of their books and records and to make contributions to the Plaintiff Funds for hours worked by individuals who performed services for covered work under the terms of the Bricklayer's union contract.

2.     That in order for the Plaintiff Funds to be entitled to the relief they seek, there must, in fact, be a union contract applicable to and binding the Defendants and requiring the Defendants to make said fringe benefit contributions.

3.     That as a result of the conduct of a union representative, who is also a trustee of the Plaintiff Funds, the Union acknowledged that the contract was terminated, thereby relieving Defendants from all obligations under the union contract, including any obligation to contribute to the Plaintiff Funds.

4.     That as a matter of law, because there is no union contract binding the Defendants, there is no basis upon which to compel Defendants to submit to an audit and to make contributions to the Plaintiff Funds.

5.     That pursuant to Local Rule 7.1(a)(2), counsel for Defendants sought the concurrence of counsel for Plaintiffs in the relief sought in this cross-motion and said concurrence was denied.

WHEREFORE, Defendants respectfully submit that, based upon the stipulated facts, the pleadings in this matter, and the case law discussed in the Brief submitted in

support of this Cross-Motion, this Court must declare that the union contract has been terminated and that Plaintiffs are not entitled to the relief they seek.

**PLUNKETT COONEY**

By:  /s/ Stanley C. Moore, III
       Stanley C. Moore, III (P23358)
       Attorney(s) for Defendants
       38505 Woodward Avenue, Suite 2000
       Bloomfield Hills, MI  48304
       (248) 901-4011
       smoore@plunkettcooney.com

DATED:  December 14, 2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Trustees of the
BRICKLAYERS PENSION TRUST FUND –
METROPOLITAN AREA; BRICKLAYERS AND
TROWEL TRADES INTERNATIONAL RETIREMENT
SAVINGS PLAN; BRICKLAYERS HOLIDAY TRUST
FUND, METROPOLITAN AREA; TROWEL TRADES
HEALTH AND WELFARE FUND, DETROIT AND
VICINITY; BRICKLAYERS AND TROWEL TRADES
INTERNATIONAL PENSION FUND; DETROIT
METROPOLITAN MASONRY JOINT APPRENTICESHIP
AND TRAINING COMMITTEE; BRICKLAYERS
INTERNATIONAL MASONRY INSTITUTE;
LABOR-MANAGEMENT COOPERATION COMMITTEE,

    Plaintiffs,

v              Case No. 08-15200
               Hon. ROBERT H. CLELAND

METRO JOINT SEALANTS, L.L.C./ METRO
JOINT SEALANTS OF MICHIGAN, INC.,

    Defendants.

_____/

| SACHS WALDMAN | PLUNKETT COONEY |
|---|---|
| George H. Kruszewski (P25857) | Stanley C. Moore, III (P23358) |
| Hope L. Calati (P54426) | Attorney(s) for Defendants |
| Amy Bachelder (P26401) | 38505 Woodward Avenue, Suite 2000 |
| Attorney(s) for Plaintiffs | Bloomfield Hills, MI  48304 |
| 1000 Farmer Street | (248) 901-4011 |
| Detroit, MI  48206 | smoore@plunkettcooney.com |
| (313) 965-3464 | |
| gkruszewski@sachswaldman.com | |

_____/

**DEFENDANTS' BRIEF IN RESPONSE TO PLAINTIFFS' MOTION
AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION
FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................. ii

INTRODUCTION............................................................................................. 2

ISSUE PRESENTED ....................................................................................... 2

STANDARDS OF REVIEW ............................................................................. 3

COUNTER STATEMENT OF FACTS ........................................................... 3

ARGUMENT .................................................................................................... 8

    I.    RESPONSE TO PLAINTIFF FUNDS' MOTION ..................................... 8

    II.   LACK OF A BINDING UNION CONTRACT IS A
        DEFENSE IN AN ERISA ACTION ......................................................... 9

    III.  THE COURSE OF CONDUCT OF THE PARTIES
        SHOWS THE CONTRACT WAS TERMINATED .................................. 10

CONCLUSION ................................................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                          **<u>Page</u>**

<u>Central States, Southeast & Southwest Areas Pension Fund</u>
<u>v General Materials., Inc.,</u>
     2007 WL 496696 (E.D. MI 2007) (unpublished)................................................... 10

<u>Central States, Southeast & Southwest Areas Pension Fund</u>
<u>v General Materials., Inc.,</u>
     535 F.3d 506 (6th Cir. 2008)................................................................................. 11

<u>Laborers Health & Welfare Trust Fund for Northern California</u>
<u>v Leslie G. Delbon Co., Inc.,</u>
     199 F. 3d 1109 (9th Cir. 2000)............................................................................. 10

<u>Laborers Pension Trust Fund Detroit and Vicinity</u>
<u>v Interior Exterior Specialists Construction Group, Inc.,</u>
     479 F. Supp. 2d 674 (E.D. MI 2007) ..................................................................... 9

<u>Plumbers & Pipefitters Local Union No. 572 Health &</u>
<u>Welfare Fund v A&H Mechanical Contractors, Inc.,</u>
     100 Fed. Appx. 396 (6th Cir. 2004) (unpublished)................................................. 8

<u>Sheet Metal Workers International Assn. v West Coast Sheet Metal Co.,</u>
     954 F.2d 1506 (9th Cir. 1992)............................................................................... 10

<u>St. Clair Intermediate School District v Intermediate Education Association,</u>
     458 Mich. 540, 581 N.W.2d 707 (1998)............................................................... 19


**<u>Statutes</u>**

ERISA §515 (29 U.S.C. 1145) ........................................................................................... 8


**<u>Treatises</u>**

Restatement (Third) of Agency (2006)............................................................................. 19

## Introduction

The Defendants, METRO JOINT SEALANTS, INC. and METRO JOINT SEALANTS, LLC, have filed a Cross-Motion seeking judgment on the pleadings and requesting that this Court deny the Plaintiff Funds the relief they seek in the Complaint and Motion they filed. Plaintiff Funds seek to conduct an audit of the financial books and records of and to compel Defendants to make fringe benefit contributions to the Funds arising out of a union contract with the Bricklayer's union. Defendants contend the union contract was terminated and there is now no basis on which Plaintiff Funds are entitled to relief they seek.

Through their counsel, the parties engaged in extensive discovery, and based upon a conference with the Court, a determination has been made that the Court shall rule in this matter based upon a trial on the papers, and shall render a judgment on the pleadings.

For purposes of these proceedings only, Defendants have stipulated that METRO JOINT SEALANTS, INC. and METRO JOINT SEALANTS, LLC are one and the same entity should there be a determination by the Court that the union contract is binding on the Defendants. Accordingly, for the remainder of this Brief, the Defendants shall be collectively referred to as "MJS."

## Issue Presented

*Has the union contract that formerly bound MJS to submit to an audit and to make contributions to the Plaintiff Funds been terminated?*

Plaintiff Funds submit that the answer is "No."

MJS submits that the answer is "Yes."

## **Standards of Review**

Counsel for MJS agrees that the Standards of Review in Plaintiff Funds' Brief (except for the first sentence of the first paragraph on page 1) are the appropriate standards in this case.

## **Counter Statement of Material Facts**

In her Brief, counsel for Plaintiff Funds has set forth a Statement of Material Facts which counsel for MJS accepts as far as they go. However, counsel for MJS believes that the following Stipulated Facts and supporting Exhibits (referred to by the numbers used in Appendix A of the Joint Appendices) go to the heart of the issue in this case.

1.  On August 26, 2002, Defendant Metro Joint Sealants, LLC (herein referred to singularly or collectively with Defendant Metro Joint Sealants of Michigan, Inc. as "MJS" or the "Company") by its President Timothy P. Frankland (herein referred to as "Frankland"), entered into a collective bargaining agreement with Bricklayers' and Masons' Union Local 1 of Michigan, Bricklayers and Allied Craftsworkers International Union of North America, AFL-CIO (herein referred to as the "Bricklayers" or the "Union"). (*Exhibit 1*, also referred to as "2002 Memorandum of Understanding".)

5.  The 2002 MOU by its terms provides that MJS agrees to adopt and continue in full force the 2002-2007 Bricklayers agreement which had not at that time been reduced to written form.

6.  On October 17, 2002, the Union mailed a copy of the 2002-2007 agreement to MJS (*Exhibit 3*).

8.  In his deposition testimony, Frankland conceded that he was covered by the Union contract until the time of the settlement payment and entry of the Satisfaction of Judgment on May 4, 2006.

9.   Following timely notice with regard to the 2002-2007 Bricklayers agreement, the Union and the Labor-Management Cooperation Committee ("LMCC") negotiated an agreement effective by its terms from 2007-2010 (*Exhibit 5*).

10.   The LMCC and the Union extended the 2007-2010 collective bargaining agreement to 2011 (*Exhibit 6*).

11.   MJS is not an employer member of the LMCC.

12.   MJS did not send any notice specified in any of the collective bargaining agreements described above.

14.   MJS is an employer engaged in the construction industry which does interior and exterior joint sealant work and below-grade waterproofing work primarily on new construction.

18.   On November 21, 2003, an audit of MJS was conducted by Roger Dahl, Trust Investigator for the Bricklayers Fringe Benefit Funds (plaintiffs herein) for the period October 26, 2002 through October 31, 2003.

20.   The only audit performed by Plaintiff Funds as to MJS is that described above in November 2003 by Roger Dahl.

23.   A consent judgment was entered on June 29, 2004, approved as to form and content by Frankland, individually and on behalf of MJS, which confirmed the January 19, 2004 award of the LMCC and required Frankland and MJS, inter alia to pay wages totaling $11,293.70 to three employees and to pay $16,587.12 to the Bricklayers Fringe Benefit Funds, plaintiffs herein (*Exhibit 9*).

27.   The June 29, 2004 judgment was referred by George Kruszewski of Sachs Waldman to the law firm of Erman, Teicher, Miller, Zucker and Freedman (herein "Erman Teicher") for post-judgment collection efforts in January 2005.

28.   On February 28, 2005, Frankland prepared a written settlement offer which he transmitted to the law firm of Erman Teicher which proposed settling the case for a total sum of $12,000 by April 21, 2005 to be paid in two equal installments of $6000, one on March 21, 2005 and one on April 21, 2005 (*Exhibit 12*).

29.   Frankland met with Robert Wine, an attorney from Erman Teicher in March 2005 for a judgment debtor examination, at which Frankland's settlement offer was discussed.  During this meeting, Robert Wine made notes on a copy of Frankland's settlement offer.  These notes state:

> wants to drop out of
> union-cut ties
> after settlement
> until 2007

A copy of the original document on which Wine made notes is attached [*in the Joint Appendices*] as *Exhibit 13* and is also referred to herein as the "Wine document."

30. Wine testified that he would have passed the information he received from Frankland on to the trustees of the Funds.

39. On May 4, 2006 a Satisfaction of Judgment was entered in Case No 04-71079 (*Exhibit 19*).

40. Chuck Kukawka is currently employed by the Union. He began his employment in 1995 as a part-time employee. He became a full-time Union representative in 2005.

41. Kukawka became the financial secretary/treasurer of the Union on July 1, 2008.

42. From March to September 2008 Kukawka became a trustee of Plaintiffs' Funds except that he has never been a trustee of either of the International Funds.

43. Each of Plaintiff Funds is governed by a board of trustees. Each board is comprised of a number of trustees designated by employers and an equal number of trustees designated by the Union.

44. All Union representative trustees of Plaintiffs (except the International Funds) are also representatives of Local 1, Bricklayers.

45. Chuck Kukawka, also known as Chuck Kaye, was the Union representative who initially signed up MJS as a union company in August 2002.

46. Kukawka graduated from Villanova University in 1984. He has a Bachelor of Arts and majored in psychology and minored in philosophy.

47. In his deposition, Kukawka testified that an employer must be signatory to a contract to make fringe benefit contributions to the Funds.

48. In approximately June 2006, at a Detroit Medical Center Children's Hospital project in Clinton Township, Frankland and his Project Manager and Estimator, Michael Davis, had a brief conversation with Kukawka as they drove off the property through a picket line in which Kukawka was participating.

49.     Kukawka asked Frankland how he was doing and Frankland responded that he was doing well.  Frankland said that he was doing better now that he was not covered by the union agreement.  Kukawka responded that he didn't know that and would look into it.

50.     On this same day, Kukawka told other Union representatives who were picketing at the DMC jobsite, Pete Accica, Paul Dunford and Tony Scavone, that he (Kukawka) had been told that MJS was no longer covered by the Union contract.

51.     After this conversation, Kukawka called Roger Dahl, Bricklayers Trust Investigator, about MJS.  Dahl told Kukawka that Frankland had expressed to him (Dahl) that he wanted to get out of the agreement.  Kukawka did no further checking on the matter as he assumed, based on Frankland's assertion and the conversation with Dahl, that Frankland had acted in accordance with the stated intention.

52.     Kukawka testified in his deposition that there was a Union staff meeting at which MJS' non-union status was discussed.  Frankland and MJS were not aware of this staff meeting.

53.     In 2006 or 2007 Kukawka told Kevin Ryan, a management trustee of the Plaintiff Bricklayers Pension Fund and Holiday Trust Fund, that MJS was non-union.  Frankland and MJS were not aware of this conversation.

54.     The Union has a record of the 2002-2007 contract having been sent to MJS.  (*See Exhibit 3*.)

55.     The Union has no record of the 2007-2010 contract being sent to MJS.  For an unknown reason, the Union did not send a copy of the 2007-2010 contract to multiple employers.

56.     The Union has no record of the 2007-2011 contract having been sent to MJS.

57.     The Union maintains a computer system data base of contracts and contractors.

58.     On January 22, 2008 Kukawka made an entry on the Union's computer system data base stating that the Company was "non-union" (*Exhibit 20*).

59.     Sometime between September 5, 2008 and October 23, 2009, Kukawka made a correction to the Union's computer system data base, changing the recorded date MJS became a signatory to the Union contract from August 29, 2002 (an incorrect date originally entered into the system by a secretary) to August 26, 2002 (the correct date) (*Exhibits 21 and 22*).

60. Although Kukawka changed the entry of the date of the contract, he did not change the entry indicating that MJS was non-union. At the time that Kukawka made the correction described above in paragraph 59, Kukawka was aware that the issue of the union status of MJS was the subject of a legal dispute.

61. The Union maintains files in which it keeps copies of signed contracts.

62. In about August 2008, in a conversation at the Union, Kukawka told Michael Tollis, Vice President of Baro Contracting, that MJS was non-union and that Baro should be using union contractors and not be using MJS as subcontractor on the Grosse Pointe South High School project on which MJS had already performed work.

63. Mark King, Union President, was present during the conversation described in paragraph 62. At this time, King was a trustee of some of the Plaintiff Funds.

64. Frankland received a letter from Tollis verifying information that Tollis had provided to Frankland (*Exhibit 23*).

65. Tollis told Frankland that Kukawka had told him that MJS was non-union.

66. In his deposition, Kukawka testified he told Tollis that under their labor agreement, Baro was not supposed to subcontract to non-union contractors.

67. In August 2008, Kukawka told Ed Laughhunn and Jeff Findley, management representatives of Simone Contracting, that that he believed or understood that MJS was a non-union contractor and that they should be using a union contractor.

68. Frankland requested and received an e-mail from Laughhunn concerning the conversation with Kukawka (*Exhibit 24*).

69. When Kukawka made the statements described above to Tollis of Baro Contracting and Laughhunn and Findley of Simone Contracting, he had been appointed a trustee of all Plaintiff Funds except the Health and Welfare Fund (to which he was appointed in September 2008), and the International Funds, of which he was never a trustee.

70. On September 5, 2008, Frankland sent a letter to the Union stating, *inter alia*, that MJS had previously terminated its union participation and informing it that it was contemplating joining the UAW (*Exhibit 25*).

71.    On September 9, 2009, attorney George Kruszewski of Sachs Waldman, responded to Frankland's September 5, 2008 letter stating that it was the position of the Union and the Funds that MJS was bound to the 2002-2007 Bricklayers and 2007-2010 successor contract by virtue of its signing of the 2002 agreement and its failure to provide notice of termination (*Exhibit 26*).

73.    On September 11, 2008, Stefansky, Holloway & Nichols, payroll auditors for the Bricklayers Funds, requested information from Frankland and MJS in order to perform an audit of fringe benefit contributions made to the Funds (*Exhibit 27*).

## Argument

### I.  Response to Plaintiff Funds' Motion

Through their counsel, Plaintiff Funds have filed a Motion for Judgment On The Stipulated Facts, Or In The Alternative, Summary Judgment.  Plaintiff Funds seek to declare that MJS is bound by the terms of not only the 2002-2007 union contract, but also the 2007-2010 and the extended 2007-2011 contracts (*Exhibit 4, 5 and 6*).  The case law cited in support of the argument in the brief concededly does set forth the standard applicable law in typical cases under an ERISA §515 (29 U.S.C. §1145) action. However, given the facts of this case, the cases relied upon by the Plaintiff Funds are inapplicable.

In support of their position, Plaintiff Funds' cite the unpublished decision of the Sixth Circuit in *Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund v A&H Mechanical Contractors, Inc.*, 100 Fed. Appx. 396 (6th Cir. 2004) (unpublished) (attached to Joint Appendices under Tab B).  However, that case does not preclude MJS from its defense to the lawsuit brought by Plaintiff Funds.  As will be more fully set forth in Section II of this Brief, *A&H Mechanical* actually supports MJS's position that it is appropriate for the Court to determine whether a contract "still exists."

Because of the facts in the case and the law set forth in Sections II and III below, MJS submits that Plaintiff Funds' Motion must be denied and that MJS's Cross-Motion must be granted.

## II.  Lack of a Binding Union Contract is a Defense in an ERISA Action

There should be no question about an employer's ability to claim that the lack of a binding union contract is a defense to an ERISA §515 lawsuit.  And, that if there is no contract, then there is no obligation to contribute fringe benefit funds and to submit to an audit.

In *Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund v A&H Mechanical Contractors, Inc.*, 100 Fed. Appx. 396 (6th Cir. 2004) (unpublished) (attached to Joint Appendices under Tab B), the Sixth Circuit discussed exceptions to the principle that there are limited defenses available to an employer in an ERISA §515 action.  In doing so, the Court stated, in part, as follows:

> A-H's termination of the contract contention fits comfortably within these exceptions to the general rule against asserting contract defenses in an ERISA §515 action.  Instead of a precluded contract "defense," A-H's termination argument goes to the question whether a contractual promise to contribute exists in the first place ….
>
> *        *        *
>
> As A-H's termination defense represents a classically straightforward inquiry into whether the <u>contract</u> <u>still</u> <u>existed</u>, the district court permissibly considered the defense.  100 Fed. Appx. at 17-18 (Joint Appendices Tab B at 9-10) (citations and quotations omitted and emphasis added).

In *Laborers Pension Trust Fund Detroit and Vicinity v Interior Exterior Specialists Construction Group, Inc*., 479 F. Supp. 2d 674, 682-83 (E.D. MI 2007), Judge Lawson of this Court addressed the Sixth Circuit's unpublished opinion in *A&H*

*Mechanical Contractors*, *supra*. In so doing, Judge Lawson referenced the Sixth

Circuit's affirmation of the district court's adoption of an employer's contract

termination defense.

In *Sheet Metal Workers International Assn. v West Coast Sheet Metal Co.*, 954

F.2d 1506 (9th Cir. 1992), the court permitted an employer to raise union decertification

as a defense to an ERISA collection action because the employer properly assumed that

its contribution obligations were at an end once the union was decertified. Therein, the

court stated: "A contract to contribute to a Trust fund of a union with which [the

employer] has no ongoing collective bargaining relationship makes no sense." 954 F.2d

at 1509. See also *Laborers Health & Welfare Trust Fund for Northern California v*

*Leslie G. Delbon Co., Inc.*, 199 F.3d 1109 (9th Cir. 2000).

We submit that the same rationale applies in a situation where a union, by its

words and actions, has acknowledged the termination of a contractual relationship

between an employer and a union. We submit that when the relationship ends, the

contract no longer has any force or effect.

### III.  The Course of Conduct of the Parties Shows the Contract Was Terminated

By the words and actions of Chuck Kukawka, a union representative and

Plaintiff Funds trustee, the Union acknowledged the termination of the union contract.

That the Union could do so by the course of conduct engaged in by Mr. Kukawka is

supported by legal precedent.

In *Central States, Southeast & Southwest Areas Pension Fund v General*

*Materials, Inc.*, 2007 WL 496696 (E.D. MI 2007) (unpublished) (attached as Appendix A

to this Brief), affirmed on other grounds, 535 F.3d 506 (6th Cir. 2008), Judge O'Meara of this Court determined that an oral agreement existed between an employer and a union to terminate a collective bargaining agreement and that the conduct of the parties showed that no one believed the contract was in effect after its termination. Accordingly, Judge O'Meara determined that the plaintiff pension fund could not collect pension contributions from the employer except for two employees, for whom both the employer and the union agreed the employer was obligated to contribute. In so doing, the Court stated:

> In addition, General argues that an oral agreement existed between General and the local to terminate the CBA and that General agreed to contribute contributions for two employees, Smith and Swihart, until their retirements. Fred Schmid, the owner of General, is no longer competent to answer questions regarding that agreement; therefore, Plaintiffs argue that Defendant has no evidence of this oral contract. However, there is indeed evidence of such an agreement if one looks to the way the employer, the local, and the pension funds have all conducted themselves during the relevant time period. All of their conduct shows that no one believed a CBA was in effect after the termination of the 1991 CBA on December 31, 1993; and the parties all acted accordingly. 2007 WL 496696 at 3.

In this case, the course of conduct of the Plaintiff Funds, the Union, and MJS show that all parties acted as if there was no contract in effect after MJS made the settlement payment and the Satisfaction of Judgment (*Exhibit 19*) was entered on May 4, 2006.

The union contract covering the time period from June 1, 2002 through May 31, 2007 (*Exhibit 4*), on page 40 in Article XIX, provides that if an employer wishes to repudiate the contract, it must provide written notice to the Union sixty (60) days in advance of the contract termination date and sent to the Union by registered or

- 11 -

certified mail. Mr. Frankland concedes that he did not send such a notice (*SF 12*)[1].

However, Mr. Frankland also contends that in March of 2005 when he advised the

Union's and the Plaintiff Funds' attorney, Robert Wine, that MJS no longer wished to

be covered under the union contract, he provided notice that was ultimately accepted by

the Union and, correspondingly, by the trustees of the Plaintiff Funds.

Mr. Wine stated that he did report his discussions with Mr. Frankland, as noted

on *Exhibit 13* in Mr. Wine's own handwriting, to the trustees of the Funds (*SF 30*).

Counsel for Plaintiff Funds will argue that an oral repudiation is not permissible under

the terms of the labor contract, nor was it timely in this matter given that same would

have occurred in March, 2005 as opposed to sixty (60) days prior to May 31, 2007.

However, she is wrong in her contention in that the clients of Mr. Wine, both the Union

and the Plaintiff Funds, could and did ratify and accept the oral repudiation by their

conduct and/or lack of conduct. See *General Materials, supra*.

After Mr. Frankland made his statement to Mr. Wine, no action whatsoever was

taken by any representative of either the Union or the Plaintiff Funds to assert that the

2002-2007 contract was still applicable to MJS. In fact, that assertion did not occur

until September 9, 2008, over three and one-half years later (*Exhibit 26*). Both the

Union and the Plaintiff Funds in effect "gave up the ghost" and treated MJS as a non-

union entity. The one and only audit covered the period from October 26, 2002 to

October 31, 2003 (*SF 20*.) Further, after Mr. Frankland made his statement to

Mr. Wine, which statement was recorded in Mr. Wine's own handwriting (*Exhibit 13*),

no representative of the Erman Teicher law firm nor the Sachs Waldman law firm,

---

[1] Hereinafter, reference to a Stipulated Fact shall be noted as (SF _____).

counsel for both the Union and the Plaintiff Funds, ever asserted, either orally or in writing, that MJS remained bound by the union contract until the Sachs Waldman letter of September 9, 2008 (*Exhibit 26*).

Thereby, both the Union and the Plaintiff Funds acquiesced to Mr. Frankland's desire to be free of the union contract, and did so by their failure to reassert the applicability of the contract, to seek an audit for any time period after October 31, 2003, and by failing to follow-up and enforce the award of the Labor-Management Cooperation Committee. A review of that award (*Exhibit 7, Attachment C, pages 12 and 13*) will show that MJS was required to make fringe benefit contributions through the Bricklayer's Trust Investigator's Office, and to pay wages to its employees performing covered work under the union contract through the Union's offices; neither occurred. Again, both the Union and the Plaintiff Funds "gave up the ghost" and indicated by their actions and/or inaction that they were not seeking to enforce the union contract, nor to hold MJS to the requirements of same. This is just one of many actions by both the Union and the Plaintiff Funds. Thereby, both the Union and the Plaintiff Funds are bound by their acceptance of the oral repudiation of the union contract by MJS.

It is interesting to note that in June of 2006, shortly after the Satisfaction of Judgment was entered on May 4, 2006, Chuck Kukawka, the Union's business representative, had a discussion with Mr. Frankland and also MJS's employee, Mike Davis. This discussion occurred at a construction site project for the Detroit Medical Center Children's Hospital in Clinton Township (*SF 48*). Mr. Kukawka approached Mr. Frankland and Mr. Davis in Mr. Frankland's truck on the job site where

Mr. Kukawka and other union representatives were picketing.  Mr. Kukawka asked

Mr. Frankland how he was doing, and Mr. Frankland responded "better now that he

was not covered by the union agreement."  Mr. Kukawka stated that he did not know

that and would look into it (*SF 49*).  Subsequently, at that picket site after

Mr. Frankland and Mr. Davis drove off, Mr. Kukawka told three other union business

representatives, Pete Accica, Paul Dunford, and Tony Scavone, that Mr. Frankland had

stated that MJS was no longer covered by the union contract (*SF 50*).  Mr. Kukawka

admitted that he did nothing to check the validity of the statement made by

Mr. Frankland other than to talk to Roger Dahl, the Bricklayers Trust Investigator

(*SF 51*).  Mr. Kukawka testified in his deposition that there was a union staff meeting

at which MJS's non-union status was discussed (*SF 52*).  Additionally, in either 2006 or

2007, Mr. Kukawka told a management trustee of two of the Plaintiff Funds that MJS

was non-union (*SF 53*).

As of this point in time, there was absolutely no doubt Mr. Frankland believed

his company had become non-union.  He had told the Union's and the Plaintiff Funds'

attorney, Mr. Wine, and he had told the Union's representative, Mr. Kukawka, that

fact, and no one from the Union or from the Funds challenged that assertion by or belief

of Mr. Frankland.  It must be noted that Mr. Kukawka is not an inexperienced or naïve

individual.  He is a graduate of Villanova University with a Bachelor of Arts.  He

majored in psychology and minored in philosophy (*SF 46*).  He has been a union

business representative on a part-time basis since 1995, and on a full-time basis since

2005 (*SF 40*).  He became the financial secretary/treasurer of the Union on July 1, 2008

(*SF 41*).  And, he was appointed a trustee of all the local plaintiff Funds through a series of dates from March through September of 2008 (*SF 42*).

Further evidence that the Union acknowledged that the contract had been terminated arises out of Mr. Kukawka's actions regarding two construction companies that were customers of MJS.   In August 2008, Mr. Kukawka approached Michael Tollis, Vice President of Baro Contracting.  Mr. Kukawka told Mr. Tollis he had learned that MJS was doing work at the Grosse Pointe South High School project on behalf of Baro Contracting (*SF 62*).  Mr. Kukawka told Mr. Tollis that MJS was a non-union company and that Baro should be using union contractors and should not be using MJS as a subcontractor (*SF 62*).  When Mr. Kukawka made this statement to Mr. Tollis of Baro Contracting, Mark King, the union president, was present.  At this time, Mr. King was also a trustee of some of the Plaintiff Funds (*SF 63*).  When Mr. Kukawka made these statements to Mr. Tollis, he was not only a union representative, but had also been appointed a trustee of all of the local funds except for one (*SF 69*).  If anyone should have known the ramifications of his statements to Mr. Tollis regarding the "non-union" status of MJS, it would have been Mr. Kukawka, a union representative and Funds trustee.  In his deposition, Mr. Kukawka testified that an employer must be signatory to a contract to make fringe benefit contributions to the Funds (*SF 47*).

As a result of what Mr. Kukawka told Mr. Tollis, Mr. Tollis sent a letter to MJS dated August 26, 2008 and took away all of MJS's work, not only at Grosse Pointe South High School, but at all other locations (*Exhibit 23*).  Baro Contracting did this because it had been informed by Mr. Kukawka, on behalf of the Union, that MJS was non-union.  By Mr. Kukawka's advising Mr. Tollis that MJS was non-union, he,

Mr. Kukawka, acknowledged that there was no contractual relationship between MJS and the Union. In his deposition, Mr. Kukawka testified that he had made these statements and had told Mr. Tollis that under the labor agreement, Baro was not supposed to subcontract to non-union contractors (*SF 66*).

In fact, Mr. Kukawka did this not once, but twice. Also in August of 2008, Mr. Kukawka contacted Ed Laughhunn of Simone Contracting. Mr. Kukawka told Mr. Laughhunn and also Mr. Jeff Findley, management representatives of Simone Contracting, that MJS was a non-union contractor (*SF 67*). *Exhibit 24* is a copy of an e-mail sent to Mr. Frankland by Mr. Laughhunn of Simone Contracting on September 22, 2008 confirming the discussion Mr. Laughhunn had with Mr. Kukawka. Mr. Kukawka admitted that he told Mr. Laughhunn and Mr. Findley that MJS was non-union and that they should be using a union subcontractor (*SF 67*).

The Union maintains a computer system database of contracts and contractors (*SF 57*). The Union has a record of the 2002-2007 contract having been sent to MJS (*SF 54*). However, the Union has no record of the 2007-2010 contract being sent to MJS (*SF 55*). Also, the Union has no record of the 2007-2011 contract having been sent to MJS (*SF 56*). Both the 2007-2010 and the 2007-2011 were effective June 1, 2007 (*Exhibits 5 and 6*) following the expiration of the 2002-2007 contract on May 31, 2007 (*Exhibit 4*).

The most interesting thing about this case is that on January 22, 2008, Mr. Kukawka himself made an entry into the Union's computer system that tracks the status of companies covered under contracts by the Union, stating that MJS was "non-union" (*SF 58*). Any doubt as to whether the contractual relationship between the

union and MJS had been terminated is removed by that action of Mr. Kukawka.  (*See Item 1 of the Special Attention Comment section of Exhibit 20*.)  The January 22, 2008 entry by Mr. Kukawka into the Union's computer system database that MJS was non-union is the proverbial "smoking gun" showing that the 2002-2007 contract was terminated.  Also, Mr. Kukawka's discussions with representatives of Baro Contracting and Simone Contracting in August 2008 regarding MJS's non-union status and the fact that the Union has no record of even sending a copy of either the 2007-2010 or the 2007-2011 contracts to MJS clearly demonstrates that there is no contract binding MJS to contribute to the Plaintiff Funds.  This conduct by Mr. Kukawka, as a union representative and trustee, shows that the Union acknowledged that the contractual relationship with MJS was terminated.  In doing so, the Union has precluded the Plaintiff Funds from seeking the relief prayed for in their Complaint to conduct an audit and compel the payment of fringe benefit contributions.  As previously stated, if there is no contract, there is no basis upon which MJS can legally contribute to the Funds.

Mr. Kukawka now says he was mistaken in his belief that MJS had become non-union (*SF 12*).  It is one thing for Mr. Kukawka to have told other business agents and a management trustee that MJS was non-union and to now say he was mistaken in thinking that.  However, it is a completely different thing for him to have entered into the Union's computer system database on January 22, 2008 that MJS was non-union and to then have <u>acted</u> upon that belief by telling representatives of Baro and Simone that MJS was non-union, thereby causing, in the case of Baro, and attempting to cause,

in the case of Simone, MJS to lose the work it was performing for Baro and potential future work for Simone (*Exhibits 23 and 24*).

It must be remembered that this is not a situation of the Union acting separate and distinct from the Funds, thereby causing misinformation to the Funds. At the time he spoke with representatives from Baro Contracting, Mark King, the president of the union and a trustee, was also present. And, when speaking with both Baro Contracting and Simone Contracting, Mr. Kukawka was a trustee of the Funds. Also, he had a previous discussion with a management trustee regarding MJS being non-union. The interrelationship between the Union and the Funds is clearly established by the fact that in 2004, the lawsuit to collect fringe benefits from MJS was brought not by the Funds, but by the Union on behalf of the Funds (*Exhibit 7*). And, both the Funds and the Union were represented by the same law firms of Sachs Waldman and Erman Teicher.

## <u>Conclusion</u>

We recognize that this is a rare case and that the basic statement of the law is that it is a company's responsibility to repudiate a union contract in writing. However, in this case, we have the corollary where the Union acknowledged, by the action and inaction of its representatives, who are also representatives of the Plaintiff Funds, that the contractual relationship was terminated. This was not just a series of theoretical statements by the Union about MJS being non-union; but, rather, a case of the Union actually acting upon Mr. Frankland's expressed desire to a representative of the Union, as well as to the Funds' attorney, Robert Wine. By an entry into the Union's computer system noting MJS's non-union status, and then by the Union's representative, who

was also a trustee of the Funds, advising two separate contractors that MJS was non-union, thereby causing MJS to lose work, the Union itself affirmed that MJS was non-union.  The Union and the Funds cannot be allowed to act with impunity in this matter. It is submitted that both the Funds and the Union are bound by the actions of their agents and representatives.  Those agents were one and the same individuals, and the Funds cannot say that it would be improper for the Union to take action that would bind the Funds.  In fact, the conduct engaged in by Mr. Kukawka was by an individual who was both a union representative and a trustee of the Funds.  He was an agent of both entities and bound both entities by his conduct.  Restatement (Third) of Agency (2006) §§ 1.01, 1.03, 2.01, 2.03 and 3.03.  For a general discussion of agency in the labor law context *St. Clair Intermediate School District v Intermediate Education Association*, 458 Mich. 540, 581 N.W.2d 707 (1998). [See pages 13-16 of Attachment B to this Brief.]

Finally, if bound by any contract, MJS is only bound to the contract from 2002 to 2007 (*Exhibit 4*), and not by the successor contract from 2007 to 2010 (*Exhibit 5*), nor that contract which was extended from 2007 to 2011 (*Exhibit 6*) for the following reasons:

- Although the Union has record of the 2002-2007 contract being sent to MJS (*SF 54*), the Union has no record of the 2007-2010 contract being sent to MJS (*SF 55*).

- Neither does the Union have a record of the 2007-2011 contract being sent to MJS (SF *56*).

- The Union maintains a computer database of contracts and contractors (*SF 57*), and the Union maintains files in which it keeps copies of signed contracts (*SF 61*).  There is nothing in the Union's files regarding a contract for 2007-2010 or 2007-2011 for MJS.

- What the Union <u>does</u> have in its computer system database of contracts is an entry by Mr. Kukawka on January 22, 2008 that MJS is **<u>non-union</u>** (*SF 58 and Exhibit 20*).

WHEREFORE, based on the foregoing, MJS believes this is a case where the Court can look at the issue of whether there was a labor contract which required fringe benefit contributions. Initially, there was a contract. However, it is MJS's contention that the contractual relationship with the Union ended on May 4, 2006 or, at the latest date, May 31, 2007, when the 2002-2007 contract expired (*Exhibit 4*). Further, that because of the actions and inaction of Chuck Kukawka, the representative for both the Union and the Funds, the Union acknowledged that the contractual relationship it had with MJS was terminated; thereby precluding the Funds from seeking contributions, or even an audit, from MJS.

Accordingly, it is submitted that Plaintiff Funds' Motion should be denied and that MJS's Cross-Motion should be granted.

**PLUNKETT COONEY**

By:  /s/ Stanley C. Moore, III
Stanley C. Moore, III (P23358)
Attorney(s) for Defendants
38505 Woodward Avenue, Suite 2000
Bloomfield Hills, MI 48304
(248) 901-4011
smoore@plunkettcooney.com

Dated: December 14, 2009

- 20 -

<u>**CERTIFICATE OF SERVICE**</u>

I, Stanley C. Moore, III, hereby certify that on Monday, December 14, 2009, a copy of ***Defendants' Cross-Motion for Judgment on the Pleadings and Brief in Response to Plaintiffs' Motion and in Support of Defendants' Cross-Motion for Judgment on the Pleadings*** was electronically filed with the Court. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and parties may access this filing through the Court's system.

I further certify that I have mailed or will mail copies of the above-referenced documents to all non-ECF participants.

**PLUNKETT COONEY**

By:  /s/ Stanley C. Moore, III
      Stanley C. Moore, III (P23358)
      Attorney(s) for Defendants
      38505 Woodward Avenue, Suite 2000
      Bloomfield Hills, MI  48304
      (248) 901-4011
      smoore@plunkettcooney.com

Blmfield.20643.90758.1193549-2