# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRICKLAYERS PENSION TRUST FUND
- METROPOLITAN AREA, et al.,

      Plaintiffs,

v.                                   Case No. 08-CV-15200

METRO JOINT SEALANTS, LLC, et al.,

      Defendants,

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR JUDGMENT AND DENYING DEFENDANTS' MOTION FOR JUDGMENT

Before the court are cross-motions for judgment. The court has reviewed the briefs, and concludes that no hearing is necessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will deny Defendant's motion and grant Plaintiffs' motion.

## I.  STIPULATED FACTS[1]

1. On August 26, 2002, Defendant Metro Joint Sealants, LLC (herein referred to singularly or collectively with Defendant Metro Joint Sealants of Michigan, Inc. as "MJS" or the "Company") by its President Timothy P. Frankland ("Frankland"), entered into a collective bargaining agreement with Bricklayers' and Masons' Union Local 1 of Michigan, Bricklayers and Allied Craftsworkers International Union of North America, AFL-CIO (the "Bricklayers Union" or the "Union"). (J.A. Ex. 1, also referred to as "2002 Memorandum of Understanding").

_____

[1] The following facts were presented to the court as undisputed for purposes of this lawsuit. (*See* J.A. Ex. A).

2.  The 2002 Memorandum of Understanding ("MOU") by its terms adopts the June 1, 1998 through May 31, 2002 Bricklayers Agreement.

3.  MJS also signed a copy of the signature page of the June 1, 1998 through May 31, 2002 Bricklayers Agreement.  (J.A. Ex. 2 is the1998-2002 agreement plus the signed signature page).

4.  As a result of becoming a party to Exhibits 1 and 2, MJS became obligated to make fringe benefit payments to Plaintiff Funds.

5.  The 2002 MOU by its terms provides that MJS agrees to adopt and continue in full force the 2002-2007 Bricklayers agreement which had not at that time been reduced to written form.

6.  On October 17, 2002, the Union mailed a copy of the 2002-2007 agreement to MJS. (J.A. Ex. 3).

7.  The 2002-2007 Bricklayers Agreement (J.A. Ex. 4) provides in part:

Article XIX Termination, Amendment, Reopening and Separability
Section 1. This Agreement shall remain in full force and effect until May 31, 2007, and thereafter shall be renewed from year to year unless either party hereto shall notify the other party, in writing and by registered or certified mail, at least sixty days prior to May 31, 2007, or any subsequent anniversary date, of its desire to change or terminate this Agreement. Notice by the Union to the Employer-members of the Labor-Management Cooperation Committee shall be notice to the Employer and shall have the same force and effect as though it were presented in writing directly to the Employer. The Employer agrees that, unless he notifies the Union to the contrary by registered mail at least sixty days prior to May 31, 2007, or any subsequent anniversary date, the Employer will be bound by and adopt any Agreement reached by the Labor Management Cooperation Committee during negotiations following notice by the Union whether to the Employer directly or to the Employer-members of the Labor-Management Cooperation Committee.

8.   In his deposition testimony, Frankland conceded that he was covered by the Union contract until the time of the settlement payment and entry of the Satisfaction of Judgment on May 4, 2006.

9.   Following timely notice with regard to the 2002-2007 Bricklayers agreement, the Union and the Labor-Management Cooperation Committee ("LMCC") negotiated an agreement effective by its terms from 2007-2010.   (J.A. Ex. 5).

10.   The LMCC and the Union extended the 2007-2010 collective bargaining agreement to 2011.  (J.A. Ex. 6).

11.   MJS is not an employer member of the LMCC.

12.   MJS did not send any notice specified in any of the collective bargaining agreements described above.

13.   For the purposes of this lawsuit only, Defendants admit the allegations set forth in paragraph 4 of the complaint with respect to the alter ego status of Defendants Metro Joint Sealants, LLC and Metro Joint Sealants of Michigan Inc.

14.   MJS is an employer engaged in the construction industry which does interior and exterior joint sealant work and below-grade waterproofing work primarily on new construction.

15.   During the period of time from August 2002 to present, MJS employed employees who performed joint sealant and waterproofing work which is work covered under the successive collective bargaining agreements between the Union and MJS or the LMCC, including Exhibits 1, 2, 4, 5 and 6.

16.   MJS failed to file fringe benefit contribution reports and pay fringe benefit contributions for employees performing covered work except as encompassed by the Satisfaction of Judgment described below in paragraph 39.

17.   At the request of MJS employees and Union members, the Union filed a grievance on January 2, 2004 alleging that MJS and owner Timothy P. Frankland failed to pay wages and fringe benefits to employees performing work covered under the Union contract.   (J.A. Ex. 7).

18.   On November 21, 2003, an audit of MJS was conducted by Roger Dahl, Trust Investigator for the Bricklayers Fringe Benefit Funds (plaintiffs herein) for the period October 26, 2002 through October 31, 2003.

19.   A copy of the November 21, 2003 audit was sent to MJS. The audit concluded that MJS and Frankland owed $16,587.12 to the Funds for fringe benefit contributions and liquidated damages.  (J.A. Ex. 8).

20.   The only audit performed by Plaintiff Funds as to MJS is that described above in November 2003 by Roger Dahl.

21.   In accordance with the contractual provisions of the 2002-2007 Bricklayers Agreement, the grievance was referred to a "Labor Management Cooperation Committee" established by the agreement. Pursuant to notice, a hearing was held on the grievance by the LMCC which issued a decision on January 19, 2004 that found MJS and Frankland guilty of the charges and ordered them to remedy their contractual violations by paying certain amounts.  (J.A. Ex. 7).

22.   MJS and Frankland failed to pay as ordered by the LMCC and a lawsuit was filed on March 24, 2004 seeking to confirm the arbitral award of the LMCC.  (J.A. Ex. 7).

23.  A consent judgment was entered on June 29, 2004, approved as to form and content by Frankland, individually and on behalf of MJS, which confirmed the January 19, 2004 award of the LMCC and required Frankland and MJS, inter alia to pay wages totaling $11,293.70 to three employees and to pay $16,587.12 to the Bricklayers Fringe Benefit Funds, plaintiffs herein.  (J.A. Ex. 9).

24.  On June 25, 2004, Frankland and Roger Dahl, Trust Investigator for the Bricklayers Fringe Benefit Funds, signed a settlement agreement which provided that Frankland would make three monthly payments of $250 and by October 15, 2004, he would either pay the balance owing or make a new payment plan with the Bricklayers Fringe Benefit Funds.  (J.A. Ex. 10).

25.  On July 1, 2004, attorney George Kruszewski of Sachs Waldman notified Frankland and MJS in writing that pursuant to the agreement between MJS, Frankland and Roger Dahl, he would take no steps to enforce the Judgment so long as they complied with the payment plan that had been arranged.  (J.A. Ex. 11).

26.  Frankland and MJS failed to make any payments pursuant to the June 25, 2004 settlement.

27.  The June 29, 2004 judgment was referred by George Kruszewski of Sachs Waldman to the law firm of Erman, Teicher, Miller, Zucker and Freedman (herein "Erman Teicher") for post-judgment collection efforts in January 2005.

28.  On February 28, 2005, Frankland prepared a written settlement offer which he transmitted to the law firm of Erman Teicher which proposed settling the case for a total sum of $12,000 by April 21, 2005 to be paid in two equal installments of $6000, one on March 21, 2005 and one on April 21, 2005.  (J.A. Ex. 12).

5

29.  Frankland met with Robert Wine, an attorney from Erman Teicher in March 2005 for a judgment debtor examination, at which Frankland's settlement offer was discussed. During this meeting, Robert Wine made notes on a copy of Frankland's settlement offer. These notes state: "Wants to drop out of union - cut ties after settlement until 2007." A copy of the original document on which Wine made notes is included in the J.A. as Exhibit 13 and is also referred to herein as the "Wine document."

30.  Wine testified that he would have passed the information he received from Frankland on to the trustees of the Funds.

31.  No payments were made by Frankland or MJS pursuant to the written February 28, 2005 settlement offer.

32.  On January 18, 2006, a letter was sent by attorney David M. Eisenberg of Erman Teicher to MJS and Frankland which stated that a judgment existed to pay the Bricklayers Fringe Benefit Funds the sum of $27,880.82, which had increased to $28,816.33 with accrued interest. The letter further provided that the settlement offer of the previous year of $12,000 in two installments of $6000 had been approved but that MJS and Frankland had failed to make the payments. The letter stated that Frankland and MJS had failed to comply with the settlement proposal and it was terminated and that post-judgment collection efforts would be pursued.  (J.A. Ex. 14).

33.  The January 18, 2006 letter from Eisenberg to Frankland and MJS attached a copy of Frankland's February 28, 2005 settlement offer with attorney Wine's contemporaneous notes.  (J.A. Ex. 13, the Wine document).  The copy of the Wine

6

document as it appears attached to the January 18, 2006 letter (J.A. Ex. 14), is referred to herein as the "Eisenberg document."

34. After January 18, 2006, attorney David Eisenberg and MJS and Frankland engaged in settlement discussions. In March 2006 MJS and Frankland offered to pay $12,000 to resolve the case. The Funds approved the offer if paid by April 14, 2006. On March 17, 2006 Frankland signed an acknowledgment of the terms of this offer. (J.A. Ex. 15).

35. At the time of this March 2006 settlement offer, Erman Teicher had served garnishment proceedings upon a credit union account of MJS for the amount of $2,457.62. On March 16, 2006, Frankland signed a statement permitting the credit union to release the funds immediately, without a waiting period. (J.A. Ex. 16).

36. Under the acknowledged terms signed by Frankland, the garnished amount would be offset against the settlement offer only if settlement was paid by April 14, 2006. If the settlement was not consummated by that date the garnishment amount would be an offset only against the full judgment amount. (J.A. Ex. 15).

37. The expiration date of a March 17, 2006 settlement offer was extended from April 14, 2006 to April 21, 2006. On April 7, 2006, Frankland signed an acknowledgment of the terms of this offer. (J.A. Ex. 17).

38. On April 21, 2006, Frankland presented a check to Erman Teicher for $9,542.38 which together with garnished proceeds of $2,457.62 totaled $12,000. (J.A. Ex. 18).

39. On May 4, 2006 a Satisfaction of Judgment was entered in Case No. 04-71079. (J.A. Ex. 19).

7

40. Chuck Kukawka is currently employed by the Union. He began his employment in 1995 as a part-time employee. He became a full-time Union representative in 2005.

41. Kukawka became the financial secretary/treasurer of the Union on July 1, 2008.

42. From March to September 2008 Kukawka became a trustee of Plaintiff Funds except that he has never been a trustee of either of the International Funds.

43. Each of Plaintiff Funds is governed by a board of trustees. Each board is comprised of a number of trustees designated by employers and an equal number of trustees designated by the Union.

44. All Union representative trustees of Plaintiffs (except the International Funds) are also representatives of Local 1, Bricklayers.

45. Chuck Kukawka, also known as Chuck Kaye, was the Union representative who initially signed up MJS as a union company in August 2002.

46. Kukawka graduated from Villanova University in 1984. He has a Bachelor of Arts and majored in psychology and minored in philosophy.

47. In his deposition, Kukawka testified that an employer must be signatory to a contract to make fringe benefit contributions to the Funds.

48. In approximately June 2006, at a Detroit Medical Center Children's Hospital project in Clinton Township, Frankland and his Project Manager and Estimator, Michael Davis, had a brief conversation with Kukawka as they drove off the property through a picket line in which Kukawka was participating.

49. Kukawka asked Frankland how he was doing and Frankland responded that he was doing well. Frankland said that he was doing better now that he was not covered by the union agreement. Kukawka responded that he didn't know that and would look into it.

50. On this same day, Kukawka told other Union representatives who were picketing at the DMC job site, Pete Accica, Paul Dunford and Tony Scavone, that he (Kukawka) had been told that MJS was no longer covered by the Union contract.

51. After this conversation, Kukawka called Roger Dahl, Bricklayers Trust Investigator, about MJS. Dahl told Kukawka that Frankland had expressed to him (Dahl) that he wanted to get out of the agreement. Kukawka did no further checking on the matter as he assumed, based on Frankland's assertion and the conversation with Dahl, that Frankland had acted in accordance with the stated intention.

52. Kukawka testified in his deposition that there was a Union staff meeting at which MJS's non-union status was discussed. Frankland and MJS were not aware of this staff meeting.

53. In 2006 or 2007 Kukawka told Kevin Ryan, a management trustee of the Plaintiff Bricklayers Pension Fund and Holiday Trust Fund, that MJS was non-union. Frankland and MJS were not aware of this conversation.

54. The Union has a record of the 2002-2007 contract having been sent to MJS. (J.A. Ex. 3).

55. The Union has no record of the 2007-2010 contract being sent to MJS. For an unknown reason, the Union did not send a copy of the 2007-2010 contract to multiple employers.

56.  The Union has no record of the 2007-2011 contract having been sent to MJS.

57.  The Union maintains a computer system data base of contracts and contractors.

58.  On January 22, 2008 Kukawka made an entry on the Union's computer system data base stating that the Company was "nonunion."  (J.A. Ex. 20).

59.  Sometime between September 5, 2008 and October 23, 2009, Kukawka made a correction to the Union's computer system data base, changing the recorded date MJS became a signatory to the Union contract from August 29, 2002 (an incorrect date originally entered into the system by a secretary) to August 26, 2002 (the correct date).  (J.A. Exs. 21 and 22).

60.  Although Kukawka changed the entry of the date of the contract, he did not change the entry indicating that MJS was non-union. At the time that Kukawka made the correction described above in paragraph 59, Kukawka was aware that the issue of the union status of MJS was the subject of a legal dispute.

61.  The Union maintains files in which it keeps copies of signed contracts.

62.  In about August 2008, in a conversation at the Union, Kukawka told Michael Tollis, Vice President of Baro Contracting, that MJS was non-union and that Baro should be using union contractors and not be using MJS as subcontractor on the Grosse Pointe South High School project on which MJS had already performed work.

63.  Mark King, Union President, was present during the conversation described in paragraph 62.  At this time, King was a trustee of some of the Plaintiff Funds.

10

64.  Frankland received a letter from Tollis verifying information that Tollis had provided to Frankland.  (J.A. Ex. 23).

65.  Tollis told Frankland that Kukawka had told him that MJS was non-union.

66.  In his deposition, Kukawka testified he told Tollis that under their labor agreement, Baro was not supposed to subcontract to nonunion contractors.

67.  In August 2008, Kukawka told Ed Laughhunn and Jeff Findley, management representatives of Simone Contracting, that he believed or understood that MJS was a non-union contractor and that they should be using a union contractor.

68.  Frankland requested and received an e-mail from Laughhunn concerning the conversation with Kukawka.  (J.A. Ex. 24).

69.  When Kukawka made the statements described above to Tollis of Baro Contracting and Laughhunn and Findley of Simone Contracting, he had been appointed a trustee of all Plaintiff Funds except the Health and Welfare Fund (to which he was appointed in September 2008), and the International Funds, of which he was never a trustee.

70.  On September 5, 2008, Frankland sent a letter to the Union stating, inter alia, that MJS had previously terminated its union participation and informing it that it was contemplating joining the UAW.  (J.A. Ex. 25).

71.  On September 9, 2009, attorney George Kruszewski of Sachs Waldman, responded to Frankland's September 5, 2008 letter stating that it was the position of the Union and the Funds that MJS was bound to the 2002-2007 Bricklayers and 2007-2010 successor contract by virtue of its signing of the 2002 agreement and its failure to provide notice of termination.  (J.A. Ex. 26).

72.   When Kukawka received a copy of Kruszewski's September 9, 2008 letter, he realized that he had been in error as to MJS's status. After that date, Kukawka made no further statements to contractors or their representatives that MJS is or was non-union.

73.   On September 11, 2008, Stefansky, Holloway & Nichols, payroll auditors for the Bricklayers Funds, requested information from Frankland and MJS in order to perform an audit of fringe benefit contributions made to the Funds.  (J.A. Ex. 27).

74.   On September 24, 2008, Frankland responded to Stefansy [sic] Holloway & Nichols, in writing.  (J.A. Ex. 28).  Enclosed with this letter as enclosure 2 was a document similar to but not identical to the Wine document.

75.   The enclosed document differed from that created by Wine, in that Wine's handwritten words "until 2007" are missing. The remaining Wine notes are circled and to the left appear the words "Written by Mr. Erman" with an arrow pointing to the circled words. The circling and words "Written by Mr. Erman" were written by Frankland's father who assisted him in responding to correspondence regarding the Union.  This version of the February 28, 2005 settlement offer is referred to herein as the "Frankland document." (J.A. Ex. 29).

76.   On October 10, 2008, Frankland and MJS sent a letter to Stefansy [sic] Holloway & Nichols stating, inter alia, that MJS is not in the Union.  (J.A. Ex. 30).  This letter enclosed a copy of the Frankland document described above in paragraph 75 and which is Exhibit 29.

77.   A copy of Frankland's October 10, 2008 letter with an attachment letter was faxed to attorney George Kruszewski, of Sachs Waldman.  (J.A. Ex. 31).

78.  On October 13, 2008, attorney George Kruszewski responded to Frankland's October 10, 2008 letter, rejecting Frankland's contention that it was not bound by the Union's contract.  (J.A. Ex. 32).

79.  On October 21, 2008, Frankland and MJS sent a letter to Sachs Waldman regarding the Funds' request for a payroll audit.  (J.A. Ex. 33).

80.  The document described above in paragraph 33 as the Eisenberg document (J.A. Ex. 14) is a copy of and was copied directly from the original Wine document (J.A. Ex. 13).

81.  The document described above in paragraph 75 as the Frankland document (J.A. Ex. 29), except with reference to certain additions and omissions, is a copy of the Eisenberg document (J.A. Ex. 14).

82.  From an examination and comparison of the marks on the copies of the Eisenberg document (J.A. Ex. 14) and the Frankland document (J.A. Ex. 29) with the original Wine document (J.A. Ex. 13), and conclusions based on common knowledge of degradation that occurs during the copying process, it appears that the Frankland document (J.A. Ex. 29), before additions and omissions, was made from the Eisenberg document (J.A. Ex. 14).

83.  It also appears that Exhibit 29, the Frankland document (with additions and omissions), is a later generation copy of the Eisenberg document.

84.  The handwritten notes on the February 28, 2005 Frankland settlement offer described above in paragraph 29 were written by attorney Robert Wine, then employed by Erman Teicher.

85. In his deposition on September 15, 2009, Frankland initially identified the person who wrote these notes as David Eisenberg, who was not employed by Erman Teicher until January 2006. Frankland gave a physical description of the person with whom he met partially consistent with that of Eisenberg.

86. In his deposition on October 26, 2009, Frankland, after meeting Robert Wine and hearing his testimony that the written notes were his handwriting, stated that he did not recall meeting with Robert Wine, but did recall meeting with a person whose physical description was consistent with that of David Eisenberg.

87. Frankland never met with attorney Earle Erman of Erman Teicher.

## II. STANDARD[2]

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is

---

[2]The parties rely on the standard found at Federal Rule of Civil Procedure 56, although the court originally contemplated these motions as trials on the paper. Nonetheless, whether cast as a trial on the papers or a Rule 56 motion, the court's resolution of these motions would remain the same.

appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing' –that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter,* 369 F.3d 906, 909 (2004) (citing *Celotex*, 477 U.S. at 325).  The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587 (1986)).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986).

### III. DISCUSSION

### A. Use of a Termination Defense Under Section 515 of ERISA

Defendant contends that it terminated its collective bargaining agreement with Bricklayers Union, and is thereby relieved of any contractual obligations arising out of the 2007-2010 agreement, as extended to 2011.  Plaintiffs maintain that Defendant did not terminate the contract and that therefore, due to the contract's evergreen clause, Defendant is presently bound to the agreement.  In addition, Plaintiffs assert that

Section 515 of the Employee Retirement Income Security Act ("ERISA") limits the types of defenses available to Defendant.  29 U.S.C. § 1145.

Plaintiff Funds stands in the position of a third-party beneficiary to the 2002 Memorandum of Understanding between Defendant MJS and Bricklayers Union.  *See Sw. Adm'rs. Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir. 1986).  Under traditional contract law, a third-party beneficiary is generally subject to any contract defense available to the promisor against the promisee if the promisee were to sue on the contract.  *Id.* (citing J. Calamari & J. Perillo, *The Law of Contracts* § 17-8, at 623-24 (2d ed. 1977)).  "However, a collective bargaining agreement is not a typical third-party beneficiary contract."  *Id.* (citing *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 468 (1960)).  As the Seventh Circuit explained:

> Multiemployer plans are defined-contribution in, defined-benefit out.  Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize - perhaps because employers go broke, perhaps because they are deadbeats, perhaps because they have a defense to the formation of the contract.  If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised.  Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must spend.  Litigation involving conversations between employers and local union officials -conversations to which plans are not privy-may be especially costly, and hold out especially great prospects of coming away empty-handed.

*Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7th Cir. 1989) (internal citation omitted).

Due to the expansive nature of collective bargaining agreements and their potential to create costly and complex litigation, Congress enacted § 515 of ERISA to allow "trustees of [multiemployer] plans to recover delinquent contributions efficaciously,

and without regard to issues which might arise under labor-management relations law"
*Gerber Truck*, 870 F.2d at 1153-54 (quoting 126 Cong.Rec. 23039 (1980) (remarks by
Rep. Thompson)); *see also Bakery & Confectionary Union & Indus. Int'l. Health Benefits
& Pension Funds v. New Bakery Co. of Ohio*, 133 F.3d 955, 959 (6th Cir. 1998) (same).

Under ERISA § 515:

> Every employer who is obligated to make contributions to a multiemployer
> plan under the terms of the plan or under the terms of a collectively
> bargained agreement shall, to the extent not inconsistent with law, make
> such contributions in accordance with the terms and conditions of such
> plan or agreement.

29 U.S.C. § 1145 .

Numerous court have interpreted ERISA § 515 as protecting the financial stability
of funds through limiting potential contract defenses available to employers in actions to
recover delinquent contributions.  *Louisiana Bricklayers & Trowel Trades Pension Fund
& Welfare Fund v. Alfred Miller Gen. Mansonry Contracting Co.*, 157 F.3d 404, 408-09
(5th Cir. 1998); *see also Nw. Ohio Adm'rs. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025
(6th Cir. 2001); *New Bakery*, 133 F.3d at 959.  As the Sixth Circuit explained in *New
Bakery*:

> Because, under section 515, multiemployer plans are entitled to rely on
> the literal terms of written commitments between the plan, the employer,
> and the union, the actual intent of and understandings between the
> contracting parties are immaterial. The fund thus stands much like a
> holder in due course in commercial law who is entitled to enforce the
> writing without regard to understandings or defenses applicable to the
> original parties.  By allowing multiemployer funds to enforce the literal
> terms of an employer's commitment, section 515 increases the reliability
> of their income streams, reduces the cost and delay associated with
> collection actions, and reduces or eliminates the cost of monitoring the
> formation of collective bargaining agreements.

133 F.3d at 959 (internal quotations and citations omitted).

17

Reasoning similar to that in *New Bakery* has been applied to nullify reliance on oral modifications as a defense for failure to comply with a written agreement.  *See Gerber Truck*, 870 F.2d at 1156; *see also Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co*., No. No. 93 C 3669, 1998 WL 128715, *6 (N.D.Ill. Mar. 17 1998) ("Ordinarily, employers cannot use oral agreements as a defense to a pension fund's claim for lack of contributions.").  In *Gerber Truck*, an employer only contributed to the pension funds on behalf of three specific employees rather than on behalf of all of its employees as the written terms of the contract required.  870 F.2d at 1150.  Despite the employer's argument that it had orally agreed with the union not to enforce the written terms of the contract, the court reasoned that the funds were not required to examine potential side agreements and oral modifications when determining an employer's contractual obligations.  *Id.* at 1154-56.

The Sixth Circuit endorsed *Gerber Truck's* policy of relying solely on the written terms of the contract, rather than looking to side agreements, in *Walcher & Fox*.  *See Walcher & Fox*, 270 F.3d at 1025.  In *Walcher & Fox*, an employer argued that handwritten notations on a pre-printed agreement were valid modifications of the contract.  270 F.3d at 1022.  However, since the written contract was unambiguous and the parties made no attempt to manifest their intended modifications outside of the "cursory and non-specific notes," the modifications were not enforceable.  *Id.* at 1025. Echoing *Gerber Truck*, the court reasoned that fund administrators are not required "to read the minds of contracting parties; rather, administrators may rely on the unambiguous terms of the writing."  *Id.* (citing *New Bakery*, 133 F.3d at 959 (holding that

the funds are entitled to rely on and enforce the express terms of the collective bargaining agreement in determining an employer's contractual obligations)).

This is not to say that courts have extinguished all potential defenses in actions to recover delinquent contributions under ERISA § 515. *See Alfred Miller*, 157 F.3d at 408. The following defenses are recognized in all circuit courts having analyzed the issues: (1) illegality of the contract or contributions; (2) contract is void *ab initio* e.g., by fraud in the execution; and (3) decertification of the union. *Id.* (citing *Agathos v. Startlite Motel*, 977 F.2d 1500, 1505 (3d Cir. 1992)). Further, employee benefit funds "are not entitled to enforce a nonexistent contractual obligation." *Plumbers & Pipefitters Local Union No. 572 Health & Welfare Fund v. A & H Mech. Contractors, Inc.*, 100 F. App'x 396, 402-03 (6th Cir. 2004) (quoting *Devito v. Hempstead China Shop, Inc.*, 38 F.3d 651, 654 (2d Cir. 1994). In *A & H Mechanical*, the Sixth Circuit embraced the validity of a termination defense by stating:

> A-H's termination-of-the contract contention fits comfortably within these exceptions of the general rule against asserting contract defenses in an ERISA § 515 action. Instead of a precluded contract "defense," A-H's termination argument goes to the question whether a contractual promise to contribute exists in the first instance. Section 515 after all was designed only to preclude "complex litigation concerning claims and defenses *unrelated* to the employer's promise and the plans' entitlement to the contributions." A-H's claim that it terminated the relevant agreement obligations is hardly "unrelated" to its alleged promise to make contributions on behalf of its employees.

100 F. App'x at 403 (quoting *Gerber Truck*, 870 F.2d at 1153) (internal citations omitted).

Although lack of an existing contract is a permitted defense under ERISA § 515, the defense is severely limited due to the stringent standards in place for terminating a collective bargaining agreement. *See Trs. of B.A.C. Local 32 Ins. Fund v. Fantin*

*Enters., Inc.*, 163 F.3d 965, 969 (6th Cir. 1998).  In *Fantin*, the Sixth Circuit elaborated

on these standards by stating:

> Unless ambiguous, a collective bargaining agreement is limited to the
> language contained in its four corners.  *See Baldwin-Montrose Chemical
> Co. v. International Union, United Rubber, Cork, Linoleum and Plastic
> Workers of America, AFL-CIO*, 383 F.2d 796, 798 (6th Cir. 1967).  The
> termination clause in the 1991 agreement provides clear, unambiguous
> terms upon which the contract may be canceled: through written notice by
> either party of their intent to terminate it. . . . Indeed, "[w]hen such clear
> and specific language in a labor agreement is at issue, federal courts are
> uniform in their strict interpretation of such language."  *Irwin v. Carpenters
> Health & Welfare Trust Fund for Cal.*, 745 F.2d 553, 556 (9th Cir. 1984).

163 F.3d at 969.  In addition, where a collective bargaining agreement requires written

notice of termination, oral repudiation of the contract, absent written notice, is not

sufficient to establish termination.  *See Gerber Truck*, 870 F.2d at 1156.  In *Gerber

Truck*, an employer stated it would not sign another agreement with the union, however

the court found this attempt to terminate the contract ineffective because the agreement

required repudiation of the contract through written notice of termination not oral

statements.  *Id.*

Furthermore, in order to successfully terminate a collective bargaining agreement

an employer's notice of termination must be clear and explicit.  *Alfred Miller*, 157 F.3d at

409.  In *Alfred Miller*, an employer ceased contributing benefits to the funds a month

after sending a letter to the union stating, "for the immediate future we will continue to

make monthly contributions to our local benefit funds . . . If there is a change in our

position, we will notify you in another letter."  *Id.* at 406.  The court reasoned that the

letter alone, while suggesting possible changes in the future, did not unequivocally

indicate an intent to terminate the contract.  *Id.* at 409.  Discussing the limited nature of

a termination defense the court stated:

20

> Although a district court may consider the significance of a purported
> termination, the court's examination must end following a superficial
> inquiry into the termination's effect.  Thus, a court may determine whether
> an attempted termination was timely or not.  Further, a court may review
> an alleged termination to determine if the requisite intent has been
> conveyed. However, if the issue of termination cannot be resolved through
> cursory review, the defense to a section 515 action will not succeed.

*Id.* at 409, n.12 (internal citations omitted).  Following a "superficial inquiry" and "cursory review," the court found the employer's letter to be ambiguous, untimely, and in no measure clear and explicit; thus, the employer remained bound to the contract.  *Id.* at 409.

The Sixth Circuit adopted the principle of *Alfred Miller*, which allows a cursory review of termination disputes, in *A & H Mechanical*.  The Sixth Circuit stated that "[i]n our view, the Fifth Circuit's decision sensibly balances the competing interests in avoiding complex litigation that starves a fund's necessary contributions and ensuring that the employer has a legitimate contractual obligation to make employee contributions."  *A & H Mech.*, 100 F. App'x at 403.  The Sixth Circuit recently reaffirmed its reliance on this reasoning in *Laborers Pension Trust Fund Detroit And Vicinity v. Interior Exterior Specialists Construction Group, Inc.*, No. 08-2526, 2010 WL 3521920, (6th Cir. Sep. 8, 2010).  The Sixth Circuit reiterated that a termination defense is allowed, so long as "it is evident upon 'a cursory review of the parties' actions' that the contract has been terminated" and "provid[ing] the inquiry is 'superficial.'"  *Id.* at *4 (citations omitted).  The circuit also stressed that, in conducting this inquiry, the court is not limited to the four corners of the underlying contract but may make a cursory or superficial review of the parties actions as well.  *Id.*

Thus, the Sixth Circuit permits the use of a termination defense in actions to recover delinquent funds under ERISA § 515. *See A & H Mech.*, 100 F. App'x at 403. However, such defense is subject to certain limitations. *Id.* Consequently, Defendant may present a termination defense provided that a "superficial inquiry" or "cursory review" into the record establishes that Defendant terminated its collective bargaining agreement in compliance with the standards adopted in the Sixth Circuit. *Alfred Miller*, 157 F.3d at 409; *A & H Mech.*, 100 F. App'x at 403; *see also Interior Exterior Specialists Construction Group, Inc.*, 2010 WL 3521920 at *4. If a superficial inquiry into the record fails to show clear and explicit termination of the contract, Defendant's termination defense will fail as a matter of law. *See Alfred Miller*, 157 F.3d at 409.

## B. APPLICATION OF THE SUPERFICIAL INQUIRY

The 2002-2007 collective bargaining agreement between Defendant MJS and Bricklayers Union sets forth clear requirements for terminating the contract. The agreement in part provides:

> Article XIX Termination, Amendment, Reopening and Separability
> Section 1. *This Agreement shall remain in full force and effect until May 31, 2007, and thereafter shall be renewed from year to year unless either party hereto shall notify the other party, in writing and by registered or certified mail, at least sixty days prior to May 31, 2007, or any subsequent anniversary date, of its desire to change or terminate this Agreement.* Notice by the Union to the Employer-members of the Labor-Management Cooperation Committee shall be notice to the Employer and shall have the same force and effect as though it were presented in writing directly to the Employer. The Employer agrees that, unless he notifies the Union to the contrary by registered mail at least sixty days prior to May 31, 2007, or any subsequent anniversary date, the Employer will be bound by and adopt any Agreement reached by the Labor Management Cooperation Committee during negotiations following notice by the Union whether to the Employer directly or to the Employer-members of the Labor-Management Cooperation Committee.

(J.A. Ex. 4) (emphasis added).  Plaintiff Funds alleges that MJS is presently bound to

the 2007-2010 collective bargaining agreement, as extended to 2011, because of the

automatic renewal, or "evergreen," clause in the contract. Both the Supreme Court and

the Sixth Circuit have expressly held that evergreen clauses are legally valid.  *Fantin*,

163 F.3d at 968 (citing *E. Enters. v. Apfel*, 524 U.S. 498 (1998)).  As the Sixth Circuit

explained, "[w]hen a contract is renewed via the operation of an evergreen clause, all of

the attendant, contractual obligations naturally continue for the period of renewal."

*Fantin*, 163 F.3d at 968-69.

MJS contends it is not presently bound to its contract with Bricklayers Union

because the Union has no records of sending MJS the 2007-2010 nor the 2007-2011

agreement.  However, due to the evergreen clause in the 2002-2007 collective

bargaining agreement between MJS and Bricklayers Union, the contract was

automatically renewed in 2007, regardless of MJS not receiving a copy of the contract.

*See Fantin*, 163 F.3d at 968-69; *see also Trs. of B.A.C. Local 32 Ins. Fund v. Silveri*, 78

F.Supp.2d 670, 678 (E.D.Mich. 2000).  Because the contract was automatically

renewed in 2007, MJS is presently bound to the agreement unless it terminated the

agreement prior to its automatic renewal.

The 2002-2007 agreement between Defendant and Bricklayers Union contains

an express provision requiring written notice of termination by registered or certified mail

60 days prior to May 31, 2007. MJS concedes that despite this explicit requirement, it

failed to send Bricklayers Union written notice of termination. Nevertheless, MJS asserts

that a superficial inquiry into the record establishes that MJS terminated its contract with

Bricklayers Union through oral repudiation or alternatively, through the conduct of

23

Bricklayers Union and the Funds.  However, MJS fails to provide any authority, nor is there any authority, supporting either of its "novel" defenses, as Plaintiff Funds aptly describes them.

For an illustration of a superficial inquiry establishing termination of contract, MJS relies on the previously discussed case, *A & H Mechanical*.  100 F. App'x at 403.  In *A & H Mechanical*, the court held that the employer's termination defense presented a "classically straightforward inquiry into whether the contract still existed."  *Id.*  Because the employer in *A & H Mechanical* wrote a letter of termination to the union in compliance with its contract, the superficial inquiry consisted solely of reading the termination letter.  *Id.* at 402-03.  In contrast, MJS has not provided a notice of termination for analysis.  Instead, MJS is attempting to qualify a collection of thirty four exhibits concerning ambiguous notations, brief conversations, and potentially mistaken beliefs as a superficial inquiry comparable to the analysis of a single termination letter. *Id.*  The inquiry MJS proposes is in no way a "classically straightforward inquiry" comparable to that in *A & H Mechanical.*  *Id.*

Similarly, Defendant's reliance on *Sheet Metal Workers' International Ass'n., Local 206 v. West Coast Sheet Metal Co.* is unfounded as that case is readily distinguishable from the case at hand.  954 F.2d 1506 (9th Cir. 1992).  In *Sheet Metal*, the court reasoned that an employer's contracts with both a union and the accompanying funds were terminated following the decertification of the union.  *Id.* at 1509  Unlike in *Sheet Metal*, a superficial inquiry into the record does not establish that Bricklayers Union is by any measure decertified.  *See id.*  In addition, the facts in *Laborers Health & Welfare Trust Fund for Northern California v. Leslie G. Delbon Co.,*

*Inc.*, on which MJS also relies, are distinguishable because that case involves an analysis of an employer's termination letter.  199 F.3d 1109, 1110-11 (9th Cir. 2000).  As previously indicated, MJS has not provided any such letter for analysis.  *See id.*

As set forth in *Gerber Truck*, oral repudiation without written notice of termination is not a permissible method for terminating a collective bargaining agreement.  870 F.2d at 1156; *see also Fantin*, 163 F.3d at 969.  However, in an attempt to validate its oral repudiation defense, MJS relies on the unpublished decision *Central States, Southeast and Southwest Areas Pension Fund v. General Materials, Inc.*  No. 04-73593, 2007 WL 496696, at *4 (E.D.Mich. Feb. 12, 2007), *aff'd on other grounds*, 535 F.3d 506 (6th Cir. 2008).  In *General Materials*, an employer claimed that it sent written notice of termination to the union and formed an oral agreement with the union allowing the employer to contribute to the funds on behalf of only two employees.  *Gen. Materials*, 2007 WL 496696, at *1.  However, the employer failed to send similar notice to the funds to terminate its accompanying participation agreement.  *Id.*  When the funds later took action to collect from the employer, the court found in favor of the employer, based on the behavior of the parties as well as the employer's oral agreement with the union and the delayed action of the funds in attempting to collect contributions.  *Id.* at *4.

MJS contends that Timothy Frankland, President of MJS, orally terminated MJS's contract with Bricklayers Union in March of 2005 during a meeting with Robert Wine, attorney from Erman Teicher.  On a document referred to as the "Wine document," Wine wrote "wants to drop out of union - cut ties after settlement until 2007."  While a generous reading of these handwritten notations demonstrates Frankland's desire to withdrawal from the contract, a mere intent, absent further compliance with the

contract's termination provision, falls short of the required "clear and explicit" notice of termination set forth in *Alfred Miller*. 157 F.3d at 409; *see Gerber Truck*, 870 F.2d at 1156; *see also Walcher & Fox*, 270 F.3d at 1025 (holding that handwritten notations on a printed agreement were not valid modifications of the contract where the parties failed to further manifest their intentions).

The key difference between *General Materials* and the case at hand is the existence of written notice of termination. 2007 WL 496696, at *1. MJS is attempting to apply the reasoning of *General Materials*, where a defense of oral repudiation was collaborated with written notice of termination to the union, to Defendant's oral repudiation defense where no such letter of termination exists. *Id.* Even if the facts in *General Materials* were not distinguishable, expanding the reasoning of *General Materials* to include Defendant's defense would run contrary to the Sixth Circuit's subsequent review of *General Materials*. *See Gen. Materials*, 535 F.3d at 509.

In affirming *General Materials*, the Sixth Circuit did not analyze any oral agreements or conduct of the parties; rather it reasoned that the collective bargaining agreement and participation agreement went hand in hand, thus when the collective bargaining agreement expired, the participation agreement also expired. *Gen. Materials*, 535 F.3d at 509. As a result of MJS's failure to comply with the termination requirements of its contract and the lack of authority supporting MJS's oral repudiation defense, expanding the reasoning of *General Materials* to include MJS's defense is unreasonable; thus MJS's oral repudiation defense fails as a matter of law. *See Gen. Materials*, 2007 WL 496696, at *4.

Additionally, MJS asserts that after Frankland's meeting with Wine, neither the Funds nor the Union took steps to reaffirm MJS's contractual obligations, thereby acquiescing MJS's oral repudiation.  However, even setting aside the ample amount of authority invalidating oral repudiation as a substitute for complying with a contract's termination provision, the record fails to establish that the inaction by the Union or the Funds translates into the parties accepting MJS's oral repudiation.  Although neither the Funds nor the Union took steps to confirm MJS's continued acceptance of the contract, it was not their responsibility to do so. Moreover, no evidence purported that MJS did anything other than express its desire to withdrawal from the contract, and because MJS failed to send written notice of termination to manifest its desire, neither party had reason to confirm MJS's status.

Alternatively, MJS contends that the conduct of both Bricklayers Union and the Funds following Frankland's conversation with Chuck Kukawka, a Union representative, establishes that the contract was terminated. Where a collective bargaining agreement contains a termination clause requiring written notice of termination and the employer fails to send such notice, the conduct of the union is not sufficient to terminate the contract.  *Silveri*, 78 F.Supp.2d at 678.  In *Silveri*, an employer told union representatives who visited the employer's job site that the employer no longer had a contract with the union.  78 F.Supp.2d at 678.  Following this conversation, the union protested against the employer as "non-union contractors."  *Id.*  Despite the union's conduct, the court reasoned that because the employer's contract contained a provision for formal notice of termination, compliance with such provision was required to

terminate the contract.  *Id.*  Therefore, the employer remained contractually obligated to contributed to the funds.  *Id.*

Silveri presents circumstances similar to those surrounding MJS's conduct defense.  *See id.*  Analogous to the employer in *Silveri*, Frankland, President of MJS, told Kukawka, a Bricklayers Union representative, that MJS was no longer bound by its Union contract.  *See id.*  Subsequently, Kukawka acted on this information by telling other union representatives, a trustee of the funds, and two contractors that MJS was non-union. However, like the employer in *Silveri*, MJS never made any attempt to comply with the contract's provision for written notice of termination. 78 F.Supp.2d at 678.  Similar reasoning follows, the collective bargaining agreement between MJS and Bricklayers Union contains explicit terms on how to terminate the contract. Neither expressing a strong desire to withdrawal from the contract nor actions by the Union are enough to override the termination clause of the contract.  *See Fantin*, 163 F.3d at 969 (holding that where a collective bargaining agreements provides clear, unambiguous terms upon which the contract may be canceled, "the federal courts are uniform in their strict interpretation of such language").  Therefore, MJS's defense of termination based on conduct by the Union also fails as it is not permissible by law.  *See id.*; *see also Silveri*, 78 F.Supp.2d at 678.

Lastly, MJS contends that a superficial inquiry into the following three events establishes that MJS terminated its contract. First, in January of 2008, Kukawka entered into the Union's computer system that MJS was "non-union"; second, that in August of 2008, while in the presence of Mark King, President of Bricklayers Union, Kukawka told Baro Contracting that MJS was non-union; and third, in August of 2008, Kukawka

informed Simone Contracting that MJS was non-union.  However, none of these actions occurred until 2008, long after the "60 days prior to May 31, 2007" deadline passed. Therefore, even if MJS acted under the mistaken belief that Kukawka's conduct could serve as a substitute for written notice of termination, the record does not give rise to the inference that MJS reasonably believed the contract was terminated *before* MJS failed to send written notice and the contract automatically renewed.

Furthermore, Kukawka's conduct, absent MJS's compliance with the contract's termination provision, fails to relieve MJS of its responsibility to provide "clear and explicit" notice of termination to Bricklayers Union.  *Alfred Miller*, 157 F.3d at 409; *see Silveri*, 78 F.Supp.2d at 678.  Consequently, Kukawka's potential status as an agent of either the Union or the Funds is immaterial in establishing whether MJS is bound to its collective bargaining agreement because MJS failed to send the required written notice of termination.

While Defendant is entitled to raise its termination of contract defense, a superficial inquiry into the record fails to establish that MJS terminated its collective bargaining agreement with Bricklayers Union. Although the record provides ample evidence as to the presence of ambivalent conversations, handwritten notations, and various actions by all parties involved, an analysis of such evidence falls well outside the scope of the "superficial inquiry" or "cursory review" permitted under Section 515 of ERISA in an action to recover delinquent contributions.  *Alfred Miller*, 157 F.3d at 409; *see A & H Mech.*, 100 F. App'x at 402-03.  Therefore, summary judgement in favor of Plaintiffs is warranted and Defendant is bound to the 2007-2010 collective bargaining agreement with Bricklayers Union, as extended to 2011.

# IV. CONCLUSION

IT IS ORDERED that Plaintiffs' "Motion for Judgment on Stipulated Facts, or in the Alternative, Summary Judgment" [Dkt. #19] is GRANTED and Defendant's "Cross-Motion for Judgment on the Pleadings" [Dkt. #20] is DENIED.

The court will enter a standard judgment in favor of Plaintiffs, which may be substituted by an amended judgment, agreed upon as to form, and presented to the court by **October 14, 2010.**  In the event the parties cannot agree to the form of judgment, Plaintiffs shall file their motion for amended judgment by **October 21, 2010,** and Defendant shall file its response by **October 28, 2010**.


　S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 28, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 28, 2010, by electronic and/or ordinary mail.

　S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522